## In the Matter of BEVERLY JANE SISSON, a Neglected Child under Sixteen Years of Age.

Children's Court, Chenango County, September 21, 1934.

*Frank W. Barnes*, for the petitioner.

*Charles Bechtold* [*Ward N. Truesdell* of counsel], for the father, Howard Sisson.

BROWN, J.  The mother of Beverly Jane Sisson, a child under sixteen years of age, institutes this proceeding by a petition alleging that Beverly is a neglected child, " In that Howard Sisson, father of said child, persists in taking said child to Megiddo Mission, at or near Rochester, N. Y., against the wishes and lawful consent of the petitioner, and leaving her there for an indefinite period of time, and in other things denying said child proper associations with your petitioner, who is an invalid."  A hearing on the petition has been had.  The proof on the part of petitioner consists of the evidence of the mother and statements made, not under oath, by the child in answer to questions of counsel for the respective parties and those asked by the court.

Beverly is a bright attractive child eight years of age, having been born December 21, 1925.  The members of the household consist of the father, mother and child and a servant or servants.  The mother is an invalid, having been bedridden for about six years and suffering from acute arthritis.  She is a woman of keen intellect, capable and apparently well informed, and fondly devoted to her

little daughter. Although she is unable personally to perform those acts of motherly care which she so much desires to give, from her bed she directs and superintends the care of Beverly in her presence, the physical acts being performed by her attendants.

Some two years ago, Mr. Sisson, the father, became interested in the Megiddo teachings and beliefs. A group of this cult or a considerable portion of its members reside in the city of Rochester, N. Y., and vicinity. It is to be inferred from the proof that, up to the time Mr. Sisson became infatuated with the Megiddo belief the home atmosphere was pleasant and Mr. and Mrs. Sisson were congenial companions, living happily and contentedly. Apparently his adherence to the Megiddo Mission and the adoption of the doctrines of the sect, and especially his application of those doctrines to the life of Beverly in the manner in which she is to be brought up, have disrupted the home relations and are directly the cause of the proceedings in this court. The mother feels that the father is instilling in the mind of Beverly the Megiddo teachings and beliefs and thus leading her away from a normal development, mentally and socially, and circumscribing her vision of life with a narrow horizon of bigotry and fanaticism — that the methods employed by Mr. Sisson tend to deprive the mother of the full and sympathetic companionship of the daughter and seek to destroy the love and respect of Beverly for her mother, denying the latter the privileges of enjoying that rightful confidence that should exist between mother and daughter and depriving the child of the guidance and helpful aid which a mother's care and love can give.

In support of this contention, the mother points in her evidence to certain circumstances and occurrences in the home life affecting Beverly during the past two years. During this period it has been customary for the father to take Beverly every other week-end to Rochester, leaving home Friday afternoon and returning the following Sunday afternoon or Monday morning. While there the child attends the Megiddo Mission, remains in the household of a Megiddo enthusiast and is under and subject to the teachings of that sect. From January 1 to July 18, 1934, out of the 200 days, 50 of them were spent by the child at Rochester. From July 1 to July 18, 1934, inclusive, she was in Rochester nine of the eighteen days, remaining nights when the father was not there. Some of the trips have been made when she was not in good condition physically to go, and in these instances she has been taken without the consent and against the wishes of the mother. Mrs. Sisson complains further that the father is unwilling that Beverly visit her maternal grandparents unless accompanied by either the father or mother, the latter's condition preventing her from accompanying the child,

and when accompanied by the father she has no freedom. The father does not approve of the participation by Beverly in the usual forms of entertainment enjoyed generally by girls of her age. He objects to her listening to the radio and, to a large degree, she is deprived of the companionship of other children and cannot freely join in the usual pleasures and activities of a child of her age. Because of the objection of the father, the child was not permitted to take part in the Christmas exercises at the Baptist church in Sherburne in 1933, it being one of the Megiddo beliefs that December twenty-fifth is not the true date of Christ's birth.

Much controversy has arisen between the father and mother over the manner in which Beverly should be dressed. The father objects to the child wearing dresses of the present-day design and style, insisting that the sleeves should come to or below the elbow and the dresses should be of greater length. To meet the wishes of the father, and in a spirit of accommodation, Mrs. Sisson, as shown by the evidence, has caused the dresses ordered by her to be remodeled by lengthening the sleeves and the body of the dress. For the purposes of outdoor bathing, to meet the demands of the Megiddo faith, Beverly is required to wear a dress or a suit produced by the father from some source and which bears close resemblance to the winter sports wool costume frequently worn by young people in skating and skiing.

At the father's instigation, perhaps aided by his Megiddo friends, Beverly has committed to memory over five hundred verses, taken either from the Bible or the books and teachings of the sect. After retiring at night and before arising early in the morning, she learns or rehearses verses and also has a study period for the same purpose following the evening meal. The mother feels this is too great a mental strain and especially while the child is carrying on her school work.

The record does not disclose by affirmative proof the code of doctrines, beliefs and practices of the Megiddo sect in full. However, it may be inferred from the evidence that, among other things, the group adopt a style of dress peculiar to their beliefs; that marriage is not approved of after one has embraced the creed; that attendance at school is discontinued at the age of seventeen; that laughing is foolishness. In confirmation of this, Mrs. Sisson relates an occasion in which the following occurred between herself and daughter: " One time we were laughing, Beverly heard us laughing and asked what we were laughing about, I told her, she said, ' Mother, we are commanded to keep sober, I don't think you ought to laugh.' " As evidence of an unnatural and unwholesome teaching, Mrs. Sisson testified that, on one occasion, " Beverly

asked me one day if I were her real mother, I said yes, why did she ask, she said do I have two mothers, I explained that we only had one mother, she said I thought the person that first taught me the Megiddo religion was my mother."

To indicate the extent to which Mr. Sisson has allowed the religion professed by the Megiddo believers to take complete control of his mind and will power, one instance will illustrate. On St. Patrick's Day the mother had planned a party for Beverly in the former's room to entertain her school associates there from the time of arriving after the close of school until bedtime. During the time and while being entertained at whatever Mrs. Sisson had planned, Mr. Sisson came into the room and handed the children typewritten Bible verses with questions and answers. He had each child stand and read a verse and, after all the questions and answers had been given, he gave them a test and presented a prize to the child who answered the questions most to his liking, with the result that the party which the mother had planned for Beverly was disrupted and broken up. This unusual and seemingly inexcusable circumstance is undisputed and unexplained. It does not appear whether its purpose was to interfere with the program of entertainment planned by the mother or if the acts were inspired by the promptings of a mind obsessed of the Megiddo doctrines. At least, it is more charitable to attribute it to the latter.

Concededly the mother is at a great disadvantage in her effort to guide and direct the life of this young child. Confined to her bed and unable to take an active part in life's affairs, she cannot exert the influence on the child to the same extent she could if she were able to be about and more actively participate in the activities of this young life. Her condition enables the father to have Beverly with him, as the evidence discloses he does have, quite a portion of the time and thus assert his will power and mental force in the molding and development of the child's life. The child was examined by counsel for the father as well as counsel for the mother on the hearing and also questioned by the court. It is very apparent that the influence of the father is being used to draw this child into the belief of the Megiddo religion until she may become fully possessed of all of those beliefs, whether rational and sensible or otherwise, and that his influence has been and is becoming dominant and shaping the future life of this child to a greater extent than the sympathetic and motherly influence which Mrs. Sisson so earnestly desires to exercise. The father is in a position to take an unfair advantage and impose his will on the child's mind. She is growing up under restrictions and limitations; she is not being permitted to know the innocent pleasures, joys and charms of childhood; she

is denied that opportunity for normal development such as every child should have. There is no question as to Mr. Sisson's sincerity in the beliefs he has adopted; he has apparently become obsessed with the false idea that the Megiddo religion and creed is the only religion and only creed that should be followed and that it should entirely govern and encompass the life of this young girl, mentally, spiritually and socially. It is apparent from the undisputed evidence presented on the hearing that the father is subordinating the natural development of a normal life in this child to a blind and almost idolatrous devotion to the doctrines and teachings of the Megiddo cult.

We pass now to the authority of this court to act on the petition presented and the proofs submitted thereunder. The allegation of the petition is " that the said child is a neglected child." The neglect charged is the allegation that the father " persists in taking the child to a Megiddo Mission at or near Rochester, N. Y., against the wishes and lawful consent of the petitioner and leaving her there for an indefinite period of time and in other things denying said child proper associations with your petitioner, who is an invalid."

The Children's Court is a court of limited jurisdiction. The establishment of this court is authorized by article 6, section 18, of the Constitution. By this section and article, power was given to the Legislature to " establish Children's Courts, and Courts of Domestic Relations, as separate courts, or parts of existing courts or courts hereafter to be created, and may confer upon them such jurisdiction as may be necessary for the correction, protection, guardianship and disposition of delinquent, neglected or dependent minors, and for the punishment and correction of adults responsible for or contributing to such delinquency, neglect or dependency and to compel the support of a wife, child, or poor relative by persons legally chargeable therewith who abandon or neglect to support any of them." The Legislature, by chapter 547 of the Laws of 1922 and the acts amendatory thereto, have established in the counties of this State Children's Courts and defined the jurisdiction of such court in each county. Section 6 of the act defines the jurisdiction of Children's Court; subdivision 1 of the section, in so far as applicable to the instant case, provides: " The children's court in each county shall have within such county exclusive original jurisdiction of all cases or proceedings involving * * * (g) neglected and abandoned children, as provided herein." The petition filed in this proceeding seeks to obtain relief under such subdivision g. As just noted, this relates to " neglected and abandoned children, as provided herein." It will readily be seen that, the

petition having alleged the child is a neglected child, in order to confer jurisdiction on this court proof must be submitted sufficient to show that the child is a neglected child as that term is defined in the Children's Court Act. Subdivision 4, section 2 of the act defines a neglected child as follows: " ' Neglected child ' means a child (a) who is without proper guardianship; (b) whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child; (c) who is under unlawful or improper care, supervision, custody or restraint by any person, corporation, agency, association, institution, society or other organization or who is unlawfully kept out of school; (d) who wanders about without lawful occupation or restraint; (e) whose parent, guardian or custodian neglects or refuses, when able to do so, to provide necessary medical, surgical, institutional or hospital care for such child; (f) who is found in any place the existence of which is in violation of law; (g) who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals, or health of himself or others."

To confer jurisdiction on this court, it became necessary that proof be made that Beverly was a neglected child under the definition as given in the statute and, unless the proof showed the child to be neglected as therein defined, then this court has no power or authority to act herein. A court of limited jurisdiction is restricted in the exercise of its powers to the limitations specified in the authority authorizing, creating and establishing that court. Jurisdiction of the Children's Court is limited to questions affecting delinquent, neglected or dependent children. In *People* v. *Hopkins* (208 App. Div. 438), where the jurisdiction of a Children's Court was considered, Judge KELLOGG, writing for the Appellate Division in this department, has this to say: " We find, therefore, that the Constitution in an identical section now makes (1) *general* provision for the establishment of inferior local courts with jurisdiction not exceeding that of County Courts; and (2) *special* provision for the establishment of Children's Courts or Courts of Domestic Relations, with a jurisdiction particularly defined and restricted. Clearly the *general* provision cannot be employed to enlarge the powers granted by the *special* provision. The special provision in particular terms defines the jurisdiction which may be conferred upon Children's Courts by the Legislature and in this respect it is exclusive. Jurisdiction which may be given is limited to matters affecting ' delinquent, neglected or dependent minors,' and to the ' punishment and correction of adults responsible for or contributing to such delinquency, neglect or dependency.' Legislation con-

ferring jurisdiction in excess of that specified would to that extent be unconstitutional." And, again: "By the final clause of this provision the Legislature attempted to confer upon the Children's Courts, to be set up pursuant to its authority, jurisdiction to try offenses committed by adults against children irrespective of the relation of such offense to the ' delinquency, neglect or dependency ' of any child. In this respect the Legislature exceeded its constitutional powers. The offense charged against this defendant was an act in relation to a child who is not ' delinquent, neglected or dependent.' Therefore, although the legislation in question comprehends the offense charged, no jurisdiction was conferred upon the Children's Court of Cortland county to try and determine the offense." The same court in the case of *People* v. *DePue* (217 App. Div. 321) again reiterated the declaration made in *People* v. *Hopkins* (*supra*).

There is no proof in this case showing Beverly Jane Sisson to be a neglected child, as that term is defined in the Children's Court Act, and in the absence of such proof this court is without jurisdiction in this case. (*People* v. *Hopkins, supra; People* v. *DePue, supra.*) The Children's Court is without authority to adjudicate as to the custody of children. A view similar to this is expressed in *Matter of Walsh* v. *Walsh* (146 Misc. 604) and *Matter of Petersen* (149 id. 869).

The court is not unmindful of the provision in section 6 of the act, dealing with the subject of custody, but, as therein stated, such jurisdiction is " subject to the limitations herein provided." Those limitations have been discussed above.

The absence of jurisdiction in this court does not, however, mean that the mother of Beverly Jane Sisson does not possess equal rights with the father of control over and custody of Beverly. The mother is as much entitled to the physical possession of Beverly as the father. By statutory edict, her joint rights of guardianship equal those of her husband. Section 81 of the Domestic Relations Law declares: "A married woman is a joint guardian of her children with her husband with equal powers, rights and duties in regard to them." Such rights and powers have been recognized and enforced by the Supreme Court in which is vested jurisdiction of the custody of children. (*People* v. *Workman,* 94 Misc. 374; *People ex rel. De Laney* v. *Mt. St. Joseph's Academy,* 198 App. Div. 75.) The opinion of Judge DAVIS in that case is a clear exposition of the right of that court to act in the matter of custody of children. The case was affirmed in 234 New York, 565.

The limited jurisdiction conferred on this court makes necessary the dismissal of the proceedings.