THE PEOPLE OF THE STATE OF NEW YORK ex rel. BLANCHE SISSON, Relator, *v.* HOWARD SISSON, Respondent.

Supreme Court, Chenango County, June 29, 1935.

*Frank W. Barnes* [*H. C. Stratton* of counsel], for the relator.

*Charles B. Bechtold* [*Ward N. Truesdell* of counsel], for the respondent.

PERSONIUS, J.   This proceeding involves the custody, care and control of Beverly Jane Sisson, hereinafter, for convenience, referred to as Beverly, an infant now nine years of age.   She is the daughter of the relator and respondent and resides with them in their home at Sherburne, Chenango county, N. Y.   The matter was before the Children's Court of Chenango county in *Matter of Sisson* (152 Misc. 806).   That court held that it was without jurisdiction.   We held that this court has jurisdiction.   (*People ex rel. Sisson* v. *Sisson*, 153 Misc. 434.)   The evidence taken in Children's Court was submitted here.   We refer to the opinion of BROWN, J. (*Matter of Sisson*, 152 Misc. 806), for an authoritative and clear statement of the facts.

The relator urges, among other things, that respondent, a Megiddo, aided and abetted by other Megiddo adherents, places so much emphasis on the study and practice of the Megiddo teachings that Beverly is kept from home to an unreasonable extent, alienated in some respects from her mother, thereby destroying the natural relationship which should exist between them and tending to make her peculiar and perhaps fanatical, rather than normal.

In our view of the case, the Megiddo beliefs are not very material. However, brief reference thereto may be helpful.   The word " Megiddo " is a Hebrew word signifying, " God is in this place with a band of soldiers," or " a true soldier of God."   The church or cult was founded in 1880 by the Rev. L. T. Nichols.   It first carried on its work in a steamer on the Mississippi river; later its adherents acquired a site near Rochester where they now maintain their mission.   Maud Hembree, one of the original members, is the present pastor.   She is sincere, devout and appears well educated.   There is nothing immoral in their teachings, practices or conduct.   They accept the Bible and practice its teachings, as they construe them, very literally.   We think they may be fairly characterized as ultra religious and strict.   This has led to certain beliefs and practices which are, at least, unusual.   They seem to believe that the present " age," about 6,000 years, will end at the second coming of Christ.   Then a " few," some 144,000, will be accepted and " chosen " to start another age.   In the meantime, marriage, though not forbidden, is frowned upon, celibacy is advocated and propagation not favored, even among married members. Though not anarchistic, they refrain from participation in govern-

ment, either by voting or holding public office. Originally, attendance at public schools was not favored, because the schools were a part of the government. At present, attendance at the Megiddo school is preferred, if practical. All frivolity is disapproved; only seriousness and much Bible study is held to be profitable.

We are not here concerned with the Megiddo church and its beliefs except indirectly. We are concerned only with the question of what is for the best interests of Beverly, the question of her welfare. Our determination " is to be based solely on the welfare of the minors." (*People ex rel. Sisson* v. *Sisson, supra*, and cases cited.) While rarely and reluctantly interfering, the Supreme Court is under the duty of taking whatever steps are necessary for a child's welfare. The extreme to which a court will go in the interests of a child is illustrated in *Matter of Vasko* (238 App. Div. 128).

Mr. and Mrs. Sisson, married in 1920, have but the one child, now aged nine. They reside in a good modern house in the suburbs of Sherburne. Mr. Sisson is forty years of age, a graduate of Cornell University, and a successful produce dealer. Mrs. Sisson is about the same age, of keen intellect, capable and well informed. She suffers, however, from acute arthritis and has been bedridden for about six years. Both were adherents of and attendants at the Baptist church. Mr. Sisson was a trustee. Both apparently read Megiddo literature, Mrs. Sisson stating that since she had been confined to her bed she had read most everything available, including Christian Science literature. She denies that she ever became particularly interested, although Megiddo people called upon her and made tiresome visits. She tried to be polite to them, but finally asked them not to come to her room. Mrs. Sisson read the literature without being carried away. Mr. Sisson became not only interested but obsessed, not to say fanatical.

The relator and respondent are legally entitled to joint guardianship and joint control of Beverly. The relator, being an invalid and unable to go out or even about the house except on rare occasions, has very limited opportunity to exercise any control. The respondent, on the other hand, has every opportunity and persistently imposes his influence and control. Does Beverly's welfare require the interference of the court? This question should, we think, be determined in the light of present day generally accepted standards and thought.

Neither her comfort, education nor health are being neglected or impaired except that her frequent journeys and absences from home to some degree cause fatigue and injury to health and school work. But are these the only elements to be considered as bearing

on her welfare? We think not. A child is entitled to develop and mature normally; to enjoy childhood's normal playtime, recreation and relaxation; to grow up rationally, unwarped, without narrowness, and evenly balanced mentally. Too much serious application may be as injurious as too little. Above all a girl should enjoy the love, companionship and unrestricted comradeship of a worthy mother.

We firmly believe in the study of the Bible and religious subjects to a reasonable extent. We think there is here over-emphasis in this respect. Beverly is absent from home each school day from eight-thirty in the morning until late afternoon. At least every other week end from Friday after school until Sunday night and sometimes Monday morning, she is taken by respondent to Rochester, staying there with a Megiddo family, comparative strangers to her mother, and in exclusive association with Megiddos. On occasions she remains there without her father. Fifty days or parts of days out of two hundred were spent there. These trips are made when she is not too well, once with a fractured arm. At home each morning, sometimes before arising, and each evening, she engages in Bible study with her father and sometimes a Megiddo visitor or employee who resides at the home. She has committed about five hundred Bible verses, is urged to repeat them at odd times, for instance, while waiting for the school bus, and has attended Megiddo meetings held by her father and others at a shack in the field. A letter written by Mr. Sisson to Beverly is largely devoted to sermonizing, as is a three-page letter written to her by Brother Simmons.

On the other hand, normal activity and the innocent pleasures of childhood are limited. The celebration of Christmas on December twenty-fifth is strenuously opposed. It is claimed that the date is erroneous, as though that was vital. Christmas is not a date; it is an event. Children's parties are discouraged and have been given up. One planned by Mrs. Sisson in her room was practically broken up by Mr. Sisson who presented Bible verses, had them read and committed to memory by the children and then gave a test to see which child had best learned the lesson. Paper party costumes and valentine parties are objected to, as is the wearing of play suits, ordinary bathing suits, pajamas, and the like. Long dresses with long sleeves, made of velvet or woolen are advocated, and the light sleeveless dresses ordinarily worn disapproved. Only " useful " and " instructive " toys are approved.

Many photographs of the activities of the Megiddos were presented. In the children's photographs the toys are of the instructive sort. There is an absence of dolls, toy automobiles, fire engines,

etc., although the adults have their band and orchestra, enjoy fishing and hunting trips and hot dog roasts. Mottoes (verses) are substituted for the usual pictures on the wall. No fiction is read. Listening to the radio and viewing the motion picture is disapproved. In a letter from Brother Simmons, who seems to be very active, to Mr. Sisson, the former expresses sorrow " that Beverly has got to have a part in these foolish exercises (Christmas) dedicated to a heathen god," and the hope that she " will not enter into the spirit of their foolishness." He regrets the spending of money for " toys like large dolls" and " miniature autos." This illustrates the atmosphere and influence with which Beverly is surrounded. While this situation concerns only Mr. and Mrs. Sisson and Beverly, the Megiddos have been much interested in extending their influence over Beverly. She enjoys the trips to Rochester. Why not? Coming practically from the country, she is taken to new surroundings, to the parks, shown the flowers, the animals, the zoo, to the lake shore, to a mountain camp and entertained and made much of. She goes swimming but apparently with a dress on.

When this matter was in Children's Court, Judge BROWN ordered that Beverly remain within Chenango county. At the commencement of this proceeding, this court directed that she remain in Chenango county and that her mother be kept advised of her whereabouts. If Beverly could not go to the Megiddo, the Megiddo could come to Beverly. She was taken to various places, in Chenango county to be sure, but Megiddo adherents were there, had meetings and remained for variable periods. Pastor Maud Hembree did not personally attend but " allowed some of our members to come down, different ones," among them Brother Simmons. On one occasion Brother Simmons expressed his disapproval of Christmas, saying in part that " he feared, if Christ and Elijah should return right away, Beverly would feel most awfully bad if he came finding her taking any part in these proceedings." In a letter to Beverly he urges her to please " daddy " but makes no mention of her mother. Apparently Mr. Sisson advised with Brother Simmons. It seems that Mrs. Sisson desired Beverly with her at the former's parents and that she desired the privilege of teaching Beverly as she thought best. Apparently Brother Simmons had expressed the thought that this would be " fair." Later he recanted and wrote, " I never should have said that I thought it was the fair thing * * *. I don't know how I lost myself so far as to say it was fair." The remainder of his long letter is a discourse upon Megiddo teachings, interspersed only with the hope that the price of cabbage would not slump

" before you and we are able to get rid of ours." Megiddo visitors are frequent at the Sisson home; Megiddo employees live there. Both participate with Mr. Sisson in Beverly's instructions, this in the absence of her mother.

If we understand Christianity and its teachings, it would seek to draw this family together, rather than apart, even at the expense of yielding some not too important tenets. Here Megiddo adherents have sought to impress their doctrines upon this family at whatever cost. In the name of their form of Christianity we see a family torn asunder; the sacred relationship between this mother and her infant daughter interfered with; a crippled and bedridden woman who should be humored by her family and friends inflicted with a cruelty more refined perhaps, but not less torturing, than physical pain.

The respondent avers that he has never insisted that Beverly refrain from participating in Christmas, children's parties, and other amusements, and that he has never insisted upon her participating in Megiddo practices. Perhaps not expressly, but he dominates by his persistent attitude and influence as effectively as he could by direct command. The influence of his fellow Megiddos strengthens the domination. Notwithstanding his letters to Beverly's school teacher, he insists that he has never prevented Beverly from participating in Christmas exercises. This, he says, he left for Beverly to decide. In other words, this child at seven, eight and nine years is called upon to decide whether December twenty-fifth, or some other date, is the true date of the birth of Christ. In view of the attitude of her father and his friends, it approaches mockery to say that she is left to her free choice.

Is Beverly developing and maturing normally? At the age of eight she thinks it is " babyish " to play with dolls and would rather say verses. She has and attends no children's parties. In place of a prayer in which she mentioned her father and mother, a prayer has been substituted which does not mention individuals but only the " family " which is understood to mean the Megiddo family. She asks her mother if the latter " were her real mother," saying she " thought the person that first taught me the Megiddo religion was my mother."

Beverly, a bright, attractive child, is undoubtedly loved dearly by both parents. Yet it seems impossible to paint a true word picture of her life. Reading the entire record fails to do so, without reading between the lines. It is quite intolerable. We do not think it is for her best interests to mature in this atmosphere, counseled one way and then another, bewildered, called upon in her immaturity to determine questions beyond most adults, her

pleasures and recreations circumscribed, developing not in normal ways but quite the contrary.

The court may take one of three courses: *First*, continue the joint guardianship and control; *second*, award exclusive control to the respondent; *third*, award exclusive control to the relator. We hesitate to interfere with the joint control. No reason appears for the taking it from the relator. However, the respondent has exercised his joint control to the practical exclusion of the mother in some very vital respects. To give him exclusive control would only aggravate the situation. We think the relator can be trusted to reasonably exercise exclusive control. When the respondent first began to exercise his influence in favor of Megiddoism to the exclusion of all others, she tried to tolerate it. She endeavored to satisfy the respondent relative to Beverly's clothes by remodeling them. At a conference between the relator, respondent and their respective fathers, she submitted certain compromise propositions, among them the suggestion that Beverly should not be taken to the Megiddo mission until she was old enough to know her own mind, or that she spend as much time in an orthodox church as at the Megiddo church, or that she be taught no particular religion but left free to choose. To all these the respondent objected. He objects to Beverly's visiting her maternal grandparents in his absence and insists upon enforcing his own beliefs on Beverly's immature mind.

We feel impelled to award the control of this child to one parent or the other. We award it to the relator relying upon her to exercise her control reasonably and with that fairness which she has already displayed.

The order may provide for such modification and addition thereto as future development make advisable or necessary, upon the application of either party.

Submit order.